UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CYRUS MOFRAD,<br><br>  Plaintiff,<br><br>  v.<br><br>UNITED PARCEL SERVICE, INC.,<br><br>  Defendant. | Case No. 23-cv-01899-AMO<br><br>**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**<br><br>Re: Dkt. No. 58 |

This is an employment discrimination case. Defendant United Parcel Service, Inc.'s ("UPS") motion for summary judgment was heard before this Court on December 12, 2024. Having read the papers filed by the parties and carefully considered their arguments therein and those made at the hearing, as well as the relevant legal authority, the Court hereby **GRANTS in part and DENIES in part** UPS's motion, for the following reasons.

I.  **BACKGROUND**

 A. **Mofrad's Role at UPS**

Plaintiff Cyrus Mofrad began working for UPS in September 2018 as a part-time air ramp supervisor at the airport. *See* Mofrad Dep. (McMahon Decl., Ex. A) at 19-20. In January 2019, UPS promoted him to part-time package center supervisor, and in November 2019 UPS promoted him again to on-road supervisor. Mofrad Dep. at 21, 22-24. As an on-road supervisor, Mofrad held responsibility for training and overseeing delivery drivers (approximately 50 to 80 drivers per day), auditing the trucks of delivery drivers, and ensuring that every package was either delivered or attempted. Mofrad Dep. at 22-23, 27-28. Because delivery drivers, by definition, leave the facility each day to deliver packages unsupervised, Mofrad's interactions with drivers were limited

to mere minutes each day, and as the night shift supervisor, he was not assigned to oversee specific, individual drivers. *Id.*

### B. Interactions with Cartwright

In April 2021, while at work, a female delivery driver, Bonnie Cartwright, walked toward Mofrad, grabbed his lower back and buttocks, and attempted to kiss him on the lips. Mofrad Dep. at 32-33. Mofrad deflected the kiss and it landed on his cheek instead. *Id.* The kiss lasted for "a second or two" until Mofrad pushed her off. Mofrad Dep. at 34. After the kiss, Mofrad went to the men's restroom and then resumed his shift. Mofrad Dep. at 48-49. Mofrad does not recall the specific date on which this incident occurred. Mofrad Dep. at 33. The next day, during Mofrad's daily meeting with his supervisor, Henry Apodaca, he informed Apodaca about the kiss by Cartwright, and Apodaca said he would talk to Cartwright. Mofrad Dep. at 50-53. Mofrad also does not recall the specific date on which the conversation with Apodaca took place. Mofrad Dep. at 53.

Approximately five days later, Cartwright walked up to Mofrad while he was auditing trucks and attempted to kiss him again, but he pushed her away. Mofrad Dep. at 55-57. Cartwright held Mofrad for approximately three seconds, and her face came "within an inch" of his face. Mofrad Dep. at 62, 66-67. Mofrad pushed Cartwright away with his clipboard, told her to stop, and left the warehouse. Mofrad Dep. at 55, 56-57, 59-60, 61-63, 64. Again, Mofrad proceeded to work and finished his shift. Mofrad Dep. at 68. The next day, during their daily meeting, Mofrad informed Apodaca about the second attempted kiss. Mofrad Dep. at 68. Apodaca told Mofrad "that Bonnie Cartwright and him, they go back a long time; they went to school together. And he wasn't going to do anything to hurt her financially. So that was that." Mofrad Dep. at 68-69. Mofrad did not report either the kiss or the attempted kiss to anyone else until October 2021, when he submitted an ethics hotline complaint. Mofrad Dep. at 69-70.

Subsequent to the initial physical confrontations, Cartwright came into the same room as Mofrad when he was "off-guard" and hugged him before he "immediately" pushed her off. Mofrad Dep. at 71, 72. This occurred some three times, but Mofrad does not remember the specific dates on which these hugs occurred. Mofrad Dep. at 73. Mofrad continued to report

2

Cartwright's conduct to Apodaca, "And I would remind him that emotionally it's wearing me out, and I cannot perform my job. And he didn't care." Mofrad Dep. at 77.

Cartwright resigned from UPS on June 30, 2021. Dunn Decl. ¶ 7; *see also* Harris Dep. (McMahon Decl., Ex. C) at 49. After this date, Mofrad did not have any interaction with her. Mofrad Dep. at 84.

### C. Adverse Actions following Cartwright Incidents

Mofrad alleges that he faced several adverse actions following his complaints to Apodaca about the incidents with Cartwright:

- **Audit of Cartwright's Truck.** Mofrad asserts that Apodaca forced him to audit Cartwright's truck, though he acknowledged that auditing Cartwright's truck was part of his job responsibilities as an on-road supervisor. Mofrad Dep. at 56, 118.

- **Day-Off Scheduling.** Mofrad also alleges that Apodaca changed his shift once without notice and took away his "D day" (i.e., day off) once without notice. Mofrad Dep. at 121, 118. These two alleged incidents took place between September and August 2021. Mofrad Dep. at 128; McMahon Decl., Ex. G.

- **Falsifying Package Scans.** Mofrad also alleges that Apodaca asked him to falsify package scans. Mofrad Dep. at 117. Mofrad concedes that he refused to take part in the falsification and was never disciplined for his refusal. Mofrad Dep. at 134.

- **Timecard Fraud.** Mofrad complains that Apodaca asked him to participate in timecard fraud, but at the same time admits that Apodaca's timecard fraud was prevalent across the entire facility, was not limited to Mofrad, and did not have any impact on Mofrad's employment. Mofrad Dep. at 145, 146.

- **Negative Performance Review.** Mofrad complains that he received a "development needed" performance rating from Apodaca at the end of 2021. Mofrad Dep. at 138-141. However, Mofrad received one of his highest performance reviews as an on-road supervisor by Apodaca months earlier in July 2021. Mofrad Dep. at 141; McMahon Decl. Ex. B. Additionally, Mofrad concedes that the end-of-year "development needed" rating did not have any impact on his job responsibilities, role, or pay. Mofrad Dep. at 150.

3

**D.    UPS's Actions**

On September 26, 2021, Mofrad submitted two complaints to UPS against Apodaca – one alleging that Apodaca failed to give him certain days off, and one alleging that Apodaca asked him to falsify package scans.  Harris Dep. at 17, 19.  These internal complaints did not involve or reference Cartwright or any sexual harassment.  Mofrad Dep. at 88.  Mofrad testified that Apodaca's conduct was retaliatory and "his vendetta for me never stopped whether Bonnie was there or not . . . [H]e made it his mission to get rid of me."  Mofrad Dep. at 125-126.  Four weeks after Mofrad submitted this complaint against Apodaca, Mofrad submitted a complaint against Cartwright and Apodaca for sexual harassment.  Mofrad Dep. at 95-97; Harris Dep. at 22; Dunn Decl. ¶ 7.  UPS ultimately investigated and substantiated these complaints.  Harris Dep. at 25.  UPS encouraged Mofrad to take an approved leave of absence.  Mofrad Dep. at 173; Dunn Decl. ¶ 7.

Mofrad never consistently returned to work after that leave of absence.  He took an approved, job-protected leave of absence from October 2021 through February 2022.  Mofrad Dep. at 173.  During this time, he received disability benefits.  Mofrad Dep. at 175.  When this leave ended in February 2022, Mofrad did not return to work, despite his doctor clearing him to return.  Mofrad Dep. at 176; McMahon Decl. ¶ 7; McMahon Decl., Ex. F.  In May 2022, he submitted paperwork from another doctor placing him on total disability, and UPS approved a second leave of absence.  Mofrad Dep. at 176.  Ultimately, Mofrad was paid for all the months he was out on "unauthorized" leave except for one month – March 2022.  Mofrad Dep. at 177.  He was never disciplined for taking unauthorized leave.  Mofrad Dep. at 177.

In July 2022, Mofrad returned to work for less than three weeks.  Mofrad Dep. at 187-188.  On August 9, 2022, he went out on leave again.  Mofrad Dep. at 190-191.  He remained out on this leave until he was terminated as part of a company-wide reduction in force ("RIF") in September 2023.  Mofrad Dep. at 191.  Mofrad testified that UPS approved every single leave of absence he requested.  Mofrad Dep. at 193-194.

**E.     Termination of Mofrad's Employment**

On September 1, 2023, UPS notified Mofrad that his role was being eliminated as part of a company-wide RIF. FAC ¶ 32; Stoltz Dep. (McMahon Decl., Ex. D) at 58; Dunn. Decl., Ex. C. The sole and dispositive criteria used to determine which on-road supervisor would be impacted at the Oakland facility was length of service (i.e., original hire date). Stoltz Dep. at 51-52; Stoltz Decl. ¶ 2; Stoltz Decl., Ex. A. Local-level management was not involved in the selection decisions. Stoltz Dep. at 25-26. Indeed, by the time the decision had been made, Apodaca had been separated from the company for over a year. Harris Dep. at 70-71. The decisions were instead made at a corporate level, and the decision-makers were not involved with or aware of employee leaves of absence or reasonable accommodation requests. Stoltz Dep. at 25-26, 82. The RIF decision-makers therefore did not take Mofrad's leaves of absence into account when making the selection decision. Stoltz Dep. at 82. There was another on-road supervisor at the Oakland facility on a leave of absence at the time of the reduction-in-force who was not selected for termination because he had an earlier original hire date (and therefore, greater seniority) than Mofrad. Stoltz Decl. ¶ 3; Stoltz Decl., Ex. A. Mofrad was selected for termination because he had the most recent original hire date out of all of the on-road supervisors at the Oakland facility. *Id.*

On September 18, 2023 – after receiving notice of his termination – Mofrad submitted a request for accommodations under the Americans with Disabilities Act ("ADA"). Dunn Dep. (McMahon Decl., Ex. E) at 55-56; Dunn Decl., Ex. D. UPS denied Mofrad's accommodation request because he had already been selected for termination as part of the RIF. Dunn Dep. at 66; Dunn Decl., Ex. E. Mofrad was laid off on September 30, 2023. Dunn. Decl., Ex. C.

**II.     DISCUSSION**

UPS moves for summary judgment as to all Mofrad's claims. A party may move for summary judgment on a "claim or defense" or "part of . . . a claim or defense." Fed. R. Civ. P. 56(a). Summary judgment is appropriate when there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. *Id.* The party seeking summary judgment bears the initial burden of informing the court of the basis for its motion, and of

5

identifying those portions of the pleadings and discovery responses that demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Material facts are those that might affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute as to a material fact is "genuine" if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. *Id.*

When deciding a summary judgment motion, a court must view the evidence in the light most favorable to the non-moving party and draw all justifiable inferences in its favor. *Anderson*, 477 U.S. at 255; *Hunt v. City of Los Angeles*, 638 F.3d 703, 709 (9th Cir. 2011). The court's function on a summary judgment motion is not to make credibility determinations or weigh conflicting evidence with respect to a disputed material fact. *See T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

Where the moving party will have the burden of proof at trial, it must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party. *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007). On an issue where the nonmoving party will bear the burden of proof at trial, the moving party may carry its initial burden of production by submitting admissible "evidence negating an essential element of the nonmoving party's case," or by showing, "after suitable discovery," that the "nonmoving party does not have enough evidence of an essential element of its claim or defense to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc.*, 210 F.3d 1099, 1105-06 (9th Cir. 2000); *see also Celotex*, 477 U.S. at 324-25 (moving party can prevail merely by pointing out to the district court that there is an absence of evidence to support the nonmoving party's case). Indeed, where the nonmoving party bears the burden of proof at trial, its burden of production in opposing a motion for summary judgment " 'is not a light one' – it 'must show more than the mere existence of a scintilla of evidence' or 'some "metaphysical doubt" as to the material facts at issue.' " *Pac. Gulf Shipping Co. v. Vigorous Shipping & Trading S.A.*, 992 F.3d 893, 897 (9th Cir. 2021) (quoting *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010)).

The Court considers the parties' arguments in the same structure presented in their briefs.

### A. Sexual Harassment (First Cause of Action)

Mofrad brings a claim for sexual harassment under California's Fair Employment and Housing Act ("FEHA"), Government Code § 12940(a) & (j), on a theory of hostile work environment. *See* First Am. Compl. (ECF 41, "FAC") ¶¶ 34-45. Under FEHA, it is unlawful for an employee to be harassed by either an employer or a fellow employee because of their sex or gender, among other protected categories. Cal. Gov't Code § 12940(j). A hostile work environment claim exists under FEHA when "harassment has the purpose or effect of either interfering with the work performance of an employee, or creating an intimidating workplace." *Beltran v. Hard Rock Hotel Lic., Inc.*, 97 Cal. App. 5th 865, 878 (2023) (quoting *Rieger v. Arnold*, 104 Cal. App. 4th 451, 459 (2002)). "To establish a prima facie case of a hostile work environment, [a plaintiff] must show that (1) she is a member of a protected class; (2) she was subjected to unwelcome harassment; (3) the harassment was based on her protected status; (4) the harassment unreasonably interfered with her work performance by creating an intimidating, hostile, or offensive work environment; and (5) defendants are liable for the harassment." *Ortiz v. Dameron Hosp. Assn.*, 37 Cal. App. 5th 568, 581 (2019) (citation omitted). Actionable hostile work environment harassment must also be "both objectively and subjectively offensive." *Taylor v. Nabors Drilling USA, LP*, 222 Cal. App. 4th 1228, 1241 (2014). UPS challenges Mofrad's claim of sexual harassment on three grounds: (a) that the incidents with Cartwright were not sufficiently severe or pervasive to create a hostile work environment as a matter of law, (b) that the incidents were not objectively offensive, and (c) that the incidents were not subjectively offensive. The Court takes up these arguments in turn.

#### 1. "Severe and Pervasive"

Harassment "refers to bias that is expressed or communicated through interpersonal relations in the workplace." *Roby v. McKesson Corp.*, 47 Cal. 4th 686, 707 (2009). Harassment "consists of conduct outside the scope of necessary job performance, conduct presumably engaged in for personal gratification, because of meanness or bigotry, or for other personal motives." *Janken v. GM Hughes Elecs.*, 46 Cal. App. 4th 55, 63 (1996). Harassment claims focus on "situations in which the social environment of the workplace becomes intolerable because the

7

harassment (whether verbal, physical, or visual) communicates an offensive message to the harassed employee." *Roby*, 47 Cal. 4th at 706.  Whether a workplace environment may be considered hostile or abusive "can be determined only by looking at all the circumstances[, which] may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Miller v. Dept. of Corrections*, 36 Cal. 4th 446, 462 (2005) (citation omitted) (holding there was a triable issue of fact precluding summary judgment as to whether a hostile work environment existed).  The California Supreme Court warns that "the evidence in a hostile environment sexual harassment case should not be viewed too narrowly," and the purported wrongdoing generally must be "more than a few isolated incidents." *Lyle v. Warner Bros. Television Prod.*, 38 Cal. 4th 264, 283-84 (2006).

UPS argues that Mofrad fails to establish sufficiently severe or pervasive conduct to establish a hostile work environment claim.  In particular, UPS contrasts the incidents of kisses and hugs here to *Brooks v. City of San Mateo*, 229 F.3d 917, 921 (9th Cir. 2000), in which the Ninth Circuit rejected a hostile work environment claim based on a single, isolated incident of criminal sexual assault because the assault was not sufficiently pervasive to alter the working environment.  *See* Mot. at 9-10; *see also Brooks*, 229 F.3d at 923 ("[B]ecause Title VII and FEHA operate under the same guiding principles," courts often analyze Title VII and FEHA hostile work environment claims under federal law).

Mofrad responds by highlighting the California Legislature's express disagreement with *Brooks* in a 2019 amendment:

> (b) A single incident of harassing conduct is sufficient to create a triable issue regarding the existence of a hostile work environment if the harassing conduct has unreasonably interfered with the plaintiff's work performance or created an intimidating, hostile, or offensive working environment.  In that regard, the Legislature hereby declares its rejection of the United States Court of Appeals for the 9th Circuit's opinion in *Brooks v. City of San Mateo* (2000) 229 F.3d 917 and states that the opinion shall not be used in determining what kind of conduct is sufficiently severe or pervasive to constitute a violation of the California Fair Employment and Housing Act.
> . . .

8

> (e) Harassment cases are rarely appropriate for disposition on summary judgment. In that regard, the Legislature affirms the decision in *Nazir v. United Airlines, Inc.* (2009) 178 Cal.App.4th 243 and its observation that hostile working environment cases involve issues "not determinable on paper."

Cal. Gov't Code § 12923 (b) & (e). Mofrad argues further that this distinction between hostile work environment standards holds special weight because "[w]here FEHA and Title VII differ . . . the weight of federal precedents diminishes . . . And even as we look to federal authority, we are mindful that FEHA is a state law and we conduct an independent analysis of its provisions using state law principles." *Bailey v. San Francisco Dist. Attorney's Office*, 16 Cal. 5th 611, 626 (2024) (holding single use of racial epithet was sufficient to establish hostile work environment under FEHA).

Reviewing the facts here, Mofrad complains about (1) an attempted kiss, (2) another kiss on the cheek, and (3) some three hugs by his subordinate. FAC ¶¶ 13-14; Mofrad Dep. at 32-33, 56-57, 71, 72. On the first occasion, the entire kiss on the cheek lasted for "a second or two." Mofrad Dep. at 34. On the second occasion, Cartwright held Mofrad for approximately three seconds and her face came "within an inch" of his face before he pushed her off. Mofrad Dep. at 62, 67. Mofrad describes some three other instances where Cartwright came into the same room as him and hugged him before he "immediately" pushed her off. Mofrad Dep. at 71, 72. Mofrad describes how on each occasion he was so disturbed he was forced to leave the area and hide from Cartwright until he could calm down (*see* Mofrad Dep. at 32-37, 42-44, 46-47, 55, 56-57, 59-60, 61-63, 64, 71-72, 75-76); that Cartwright's harassment deeply disturbed him and caused severe anxiety attacks after each incident of harassment (*id.* at 76-77), and that he suffered continuous emotional distress as a result (*id.* at 70-71, 200-202, 203-204). This testimony precludes a finding that the conduct was insufficiently severe to support Mofrad's sexual harassment claim. That the incidents of sexual harassment were physical in nature – each involved unwanted touching – further enhances the severity such that the harassing conduct cannot be discounted as a matter of law. *See, e.g.*, *Herberg v. California Inst. of the Arts*, 101 Cal. App. 4th 142, 151 (2002) (holding that, for hostile environment claims based on one or a limited number of incidents, such an "incident must be severe in the extreme and generally must include either physical violence or the

threat thereof."). The weight of hostile environment authority, particularly in California law, provides that even "[a] single instance of harassment can create a triable issue regarding the existence of a hostile work environment." Cal. Gov't Code § 12923(b); *see also Beltran,* 97 Cal. App. 5th at 878; *Brooks*, 229 F.3d at 926. Accordingly, UPS is not entitled to summary judgment on this issue.

### 2. Objectively Offensive

UPS argues that Mofrad fails to establish that the conduct complained of was objectively offensive. "[T]he objective severity of harassment should be judged from the perspective of a reasonable person in the plaintiff's position, considering 'all the circumstances.' " *Lyle*, 38 Cal. 4th at 283 (citation omitted).

> [T]hat inquiry requires careful consideration of the social context in which particular behavior occurs and is experienced by its target. . . . The real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed. Common sense, and an appropriate sensibility to social context, will enable courts and juries to distinguish between simple teasing or roughhousing . . . and conduct which a reasonable person in the plaintiff's position would find severely hostile or abusive.

*Id.* at 283 (2006) (citations omitted). The California Supreme Court has confirmed that the organizational position of a harasser relative to the person being harassed is indeed relevant to the severity or pervasiveness of harassment. *Bailey*, 16 Cal. 5th at 633 (citing *Paschall v. Tube Processing Corp.*, 28 F.4th 805, 814-15 (7th Cir. 2022) (analyzing analogous federal law under same standard)).

Here, UPS attempts to contextualize Cartwright's conduct in relation to Mofrad and his position. UPS highlights that Mofrad's position as a male in power relative to his alleged harasser, a female subordinate, is relevant to the objective prong of the hostile work environment analysis. *See Fisher v. San Pedro Peninsula Hosp.*, 214 Cal. App. 3d 590, 609 n.7 (1989) (when analyzing a FEHA sexual harassment claim, "a reasonable employee is one of the same sex as the complainant"). Further, and more practically, UPS contends that Mofrad's interactions with Cartwright were limited in light of the nature of the delivery driver role (which is responsible for

1    leaving the facility every day and delivering packages unsupervised), coupled with significant
2    scope of Mofrad's own responsibilities overseeing up to 80 delivery drivers in a given day.
3    Mofrad Dep. at 27.  UPS additionally emphasizes that Mofrad admitted that his interactions with
4    Cartwright were temporally limited, as she separated from UPS less than three months after the
5    first alleged instance of harassment.  Mofrad Dep. at 83; Harris Dep. at 70, 99.

6    Viewing the evidence presented in the light most favorable to Mofrad, the Court cannot
7    agree that Cartwright and Mofrad's relative social and organizational positions would require the
8    trier of fact to conclude that Cartwright's conduct was not objectively offensive.  The five
9    instances of unwanted physical contact within the course of a three-month period, *see* Mofrad
10   Dep. at 32-33, 56-57, 71, 72, denote something more than "simple teasing or roughhousing" or
11   off-hand or trivial interactions.  *See Lyle*, 38 Cal. 4th at 283.  The evidence is sufficient to create a
12   triable issue of fact regarding whether the conduct was objectively offensive.

### 3. Subjectively Offensive

14   UPS additionally argues that Mofrad fails to establish that Carwright's conduct was
15   subjectively offensive.  *See* Mot. at 12 (citing *Taylor*, 222 Cal. App. 4th at 1241 ("[a] plaintiff who
16   does not perceive the workplace as hostile or abusive will not prevail, even if it objectively is so")).
17   UPS avers that Mofrad did not find the alleged harassing conduct subjectively offensive,
18   selectively pointing to certain evidence that he did not take the harassment seriously or that he
19   suffered greater offense from unrelated workplace conflict.  For example, UPS contends that
20   Mofrad was not particularly upset by the Cartwright incidents based on his failure to record any
21   written records surrounding the evidence and his failure to remember the specific dates on which
22   they occurred.  *See* Mofrad Dep. at 33, 53, 73, 79.  UPS further points to evidence that Mofrad
23   was more offended by workplace disagreements with his supervisor, Apodaca, than he was by the
24   unwanted contact with Cartwright.  *See* Harris Dep. at 17, 19 (describing Mofrad's numerous
25   complaints about workplace disagreements with Apodaca); McMahon Decl., Ex. F (report from
26   one of Mofrad's doctors stating that "the actions of the supervisor had more impact than the
27   unwanted hugging and kissing from the female coworker.").  However, the same record evidence
28   reveals that Mofrad described Cartwright's conduct as "sexual assault," and he suffered significant

duress, anxiety, and panic as a result of the incidents with Cartwright. *See* McMahon Decl., Ex. F (Mofrad -0038). In light of this countervailing evidence, there exists a dispute as to whether Mofrad was objectively offended by Cartwright's conduct. This dispute precludes resolution of this element as a matter of law. Overall, the Court must DENY UPS's motion for summary judgment as to Mofrad's sexual harassment claim.

### B. Retaliation (Third and Sixth Causes of Action)

Mofrad brings two retaliation claims under California Government Code § 12940(h), including what appears to be his original claim of retaliation (third cause of action, FAC ¶¶ 55-64), plus an additional claim of retaliation in response to his reasonable accommodation request and the instant lawsuit (sixth cause of action, FAC ¶¶ 84-93). Under California's FEHA, it is unlawful for an employer to "discharge, expel, or otherwise discriminate against" an employee because they have opposed practices forbidden under FEHA or filed a complaint, testified, or assisted in any proceeding under FEHA. Cal. Gov't Code § 12940(h). To assert a prima facie claim for retaliation under FEHA, a plaintiff must plead that: (1) they engaged in "protected activity," (2) the employer subjected them to an "adverse employment action," and (3) there is a "causal link" between the protected activity and the employer's action. *Yanowitz v. L'Oreal USA, Inc.*, 36 Cal. 4th 1028, 1042 (2005). An "adverse employment action" is one that "materially affects the terms, conditions, or privileges of employment," such as termination or demotion, as well as "actions that are reasonably likely to adversely and materially affect an employee's job performance or opportunity for advancement." *Id.* at 1051, 1054.

On Mofrad's third cause of action, the parties dispute whether any of the other adverse employment actions alleged by Mofrad are actionable and whether they have any nexus with Mofrad's protected activity. Relevant here, "[m]inor or relatively trivial adverse actions or conduct by employers or fellow employees that, from an objective perspective, are reasonably likely to do no more than anger or upset an employee cannot properly be viewed as materially affecting the terms, conditions, or privileges of employment and are not actionable." *Yanowitz*, 36 Cal. 4th at 1054. And while "commonly necessary personnel management actions, such as hiring and firing, job or project assignments, office or work station assignments, promotion or demotion,

12

1 performance evaluations . . . do not come within the meaning of harassment," *Reno v. Baird*, 18
2 Cal. 4th 640, 646-47 (1998) (citations omitted), the California Supreme Court has made clear that
3 "some official employment actions" can demonstrate discriminatory animus because they "can
4 also have a secondary effect of communicating a hostile message," *Roby*, 47 Cal. 4th at 709. Said
5 another way, personnel-related actions do not inherently constitute unlawful harassment because
6 they are normal parts of the employment relationship that cannot be avoided, and a claim for
7 harassment only rests where such actions communicate a demeaning message and are sufficiently
8 "severe or pervasive as to alter the working conditions." *Id.* at 708 (citations omitted).

9 UPS's arguments prevail as to each of the purported adverse employment actions.
10 Compelling Mofrad to audit Cartwright's truck was part of his job and did not represent an
11 adverse employment action. Rather, it constituted a "commonly necessary personnel management
12 action" consistent with his job duties prior to the complaints and thus does not support a claim for
13 retaliation. *Reno*, 18 Cal. 4th at 646-47. The same reasoning applies to the two relatively minimal
14 changes to Mofrad's work schedule. Mofrad's suggestion that the falsifying of package scans and
15 timecard fraud may have arisen as entrapment finds no support in the record and thus cannot
16 support a claim for retaliation. Finally, Mofrad's receipt of a "development needed" performance
17 review may have constituted an adverse employment action, particularly if Mofrad presented any
18 evidence that the less-than-stellar performance review prevented him from securing a pay raise or
19 promotion. Mofrad Dep. at 150. But that claim fails more clearly on the absence of causal
20 connection. Mofrad received a "strong performance" rating immediately following his complaints
21 about Cartwright, clearly interrupting any causal inference between his complaints and the
22 "development needed" performance review, which he did not receive until eight months later. *See*
23 Mofrad Dep. at 141; McMahon Decl. ¶ 3; McMahon Decl., Ex. B. In sum, none of UPS's conduct
24 constitutes an adverse employment action and none of it supports Mofrad's claim for retaliation.

25 Beyond the purported adverse employment actions suffered during his tenure, Mofrad
26 argues that his termination was pretextual, citing evidence that his selection for termination as part
27 of the RIF was based on different criteria than used at other UPS sites. S*ee, e.g.*, Opp. at 15-16.
28 However, the Court's analysis cannot reach pretext, the second step in the burden-shifting analysis

1  Mofrad cites, because Mofrad fails to make out a prima facie case of retaliation by failing to

2  establish a causal link between his protected activity and his termination. *See* Opp. at 15 (citing

3  *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 801-04 (1973), *Davis v. Team Elec. Co.*, 520

4  F.3d 1080, 1089 (9th Cir. 2008)). Moreover, there exists no causal link between Mofrad's

5  termination as part of the RIF and Mofrad's complaints about Cartwright's purported assaults,

6  some two years prior. Mofrad Dep. at 95-97; Harris Dep. at 22. Both Cartwright and Apodaca

7  separated from UPS years prior to the time of Mofrad's termination. Harris Dep. at 70, 99. The

8  temporal separation between his 2021 harassment reports and his 2023 termination is simply too

9  great to support a causal nexus. Moreover, Mofrad fails to present any evidence drawing a

10  connection between the complaints and his termination. In sum, Mofrad fails to establish a prima

11  facie case of retaliation in response to his complaints about Cartwright. The Court therefore

12  GRANTS UPS's motion as to the third cause of action.

13  On Mofrad's sixth cause of action, Mofrad fails to establish a causal nexus between his

14  termination and his request for reasonable accommodation because the request came after he

15  received notice of termination. Mofrad received notice of termination on September 1, 2023. *See*

16  FAC ¶ 32; Stoltz Dep. at 58; Dunn. Decl., Ex. C. Mofrad requested accommodation on September

17  18, 2023, after the decision to terminate him had already been made. *See* Dunn Dep. at 55-56;

18  Dunn Decl. ¶ 5; Dunn Decl., Ex. D. Because Mofrad fails to make a prima facie case of

19  retaliation based on his termination, his claim for retaliation based on his termination fails and the

20  Court accordingly GRANTS UPS's motion as to the sixth cause of action.

21  **C.     Failure to Prevent Sexual Harassment and/or Retaliation (Second Cause of
            Action)**
22

23  Mofrad brings a claim for failure to prevent or correct sexual harassment under California

24  Government Code § 12940(j)-(k). FAC ¶¶ 46-54. California Government Code § 12940(k)

25  makes it an unlawful employment practice for an employer "to fail to take all reasonable steps

26  necessary to prevent discrimination and harassment from occurring." Cal. Gov't Code

27  § 12940(k). California state courts have observed that this provision creates a statutory tort action

28  with the usual tort elements. *See Ellis v. U.S. Sec. Assocs.*, 224 Cal. App. 4th 1213, 1228 (2014);

*Veronese v. Lucasfilm Ltd.*, 212 Cal. App. 4th 1, 28 (2012).  Federal courts have established elements for the claim: (1) the plaintiff was subjected to discrimination, harassment, or retaliation; (2) the defendant failed to take all reasonable steps to prevent discrimination, harassment, or retaliation; and (3) this failure caused the plaintiff to suffer injury, damage, loss, or harm.  *See Aparicio v. Comcast, Inc.*, 274 F. Supp. 3d 1014, 1030 (N.D. Cal. 2017); *Pinder v. Employment Dev. Dep't*, 227 F. Supp. 3d 1123, 1141 (E.D. Cal. 2017).

UPS argues that the failure to prevent claim cannot stand because Mofrad cannot establish viable claims for sexual harassment and retaliation.  Because the Court concludes UPS is entitled to summary judgment on Mofrad's retaliation claims, Mofrad's failure to prevent retaliation must also fail.  But because the Court finds that Mofrad's sexual harassment claim should proceed to trial, the derivative failure to prevent discrimination claim should proceed with it.  *Ravel v. Hewlett-Packard Enter., Inc.*, 228 F. Supp. 3d 1086, 1098-99 (E.D. Cal. 2017) ("Because plaintiff's FEHA disability discrimination claim survives defendant's motion to dismiss, her failure to prevent discrimination claim survives the motion as well.").  The Court GRANTS summary judgment as to the portion of the second cause of action that relies on retaliation and DENIES summary judgment as to the portion of the cause of action derived from the alleged sexual harassment itself.

### D. Failure to Accommodate (Fourth and Seventh Causes of Action)

Mofrad brings a claim for failure to accommodate and engage in the interactive process in violation of California Government Code § 12940 (m)-(n) (fourth cause of action, FAC ¶¶ 65-77), plus a claim for failure to accommodate under the same statutory provisions based on Mofrad's termination (seventh cause of action, FAC ¶¶ 94-106).  To establish a reasonable accommodation claim, an employee must establish that (1) he had a cognizable disability under FEHA, (2) he was qualified to perform the essential functions of his position, and (3) the employer failed to reasonably accommodate his disability.  *Swanson v. Morongo Unified Sch. Dist.*, 232 Cal. App. 4th 954, 969 (2014) (citations omitted).

Mofrad alleges that he was entitled to a reasonable accommodation, including a medical leave of absence, but that UPS "made no timely, good faith effort to engage in an interactive

1  process." FAC ¶¶ 68, 71, 97. But it is undisputed that UPS approved all Mofrad's medical leave

2  requests. Mofrad Dep. at 194 (Q. "UPS ultimately approved all of your leave requests, correct?"

3  A. "Yes."). To the extent Mofrad argues that the September 2023 denial of his reasonable

4  accommodation request constituted a failure to accommodate, that theory fails too. UPS notified

5  Mofrad of his termination as part of the RIF on September 1, 2023. FAC ¶ 32; Stoltz Dep. at 58;

6  Dunn. Decl. ¶ 4; Dunn Decl., Ex. C. Mofrad did not initiate a request for accommodation until

7  September 18, 2023, after the termination decision had been made and communicated to him.

8  Dunn Dep. at 55-56; Dunn. Decl. ¶ 5; Dunn Decl., Ex. D. FEHA does not require an employer to

9  accommodate an employee's disability after its non-discriminatory decision to terminate him, nor

10 would any such accommodation be reasonable. *Wong v. Pape Machinery, Inc.*, 370 F. App'x.

11 871, 873 (9th Cir. 2010). Mofrad therefore cannot establish that UPS failed to reasonably

12 accommodate his disability. Accordingly, the Court GRANTS UPS's motion for summary

13 judgment on both the fourth and seventh causes of action.

### E. Wrongful Termination in Violation of Public Policy (Eighth and Ninth Causes of Action)

16 Mofrad brings two claims for wrongful termination in violation of public policy: one based

17 on violations of FEHA (eighth cause of action, FAC ¶¶ 107-115), and one based on violation of

18 the ADA (ninth cause of action, FAC ¶¶ 116-125). UPS argues that these wrongful termination

19 claims must fail because they are derivative of Mofrad's other discrimination-based claims. *See*

20 Mot. at 20-21 (citing *Featherstone v. Southern Cal. Permanente Med. Group*, 10 Cal. App. 5th

21 1150, 1169 (2017) (holding that wrongful termination in violation of public policy claim failed

22 when underlying FEHA claim failed)). UPS is correct as to Mofrad's wrongful termination claim

23 premised on violation of the ADA because, as discussed above, UPS is entitled to summary

24 judgment on Mofrad's failure to accommodate claim. The Court accordingly GRANTS UPS's

25 motion as to the ninth cause of action. On the other hand, because UPS is not entitled to summary

26 judgment on Mofrad's sexual harassment claim, as discussed above, the Court cannot conclude

27 that UPS is entitled to summary judgment on Mofrad's wrongful termination claim premised on

28 violation of FEHA. The Court therefore DENIES UPS's motion as to the eighth cause of action.

### F. Intentional Infliction of Emotional Distress (Fifth Cause of Action)

Mofrad brings a claim for intentional infliction of emotional distress under California common law. FAC ¶¶ 78-83. UPS argues that this claim fails for two reasons: (1) it is preempted by California's Worker's Compensation Act ("WCA"), and (2) Mofrad fails to establish that UPS engaged in "extreme and outrageous conduct" "with the intention of causing, or reckless disregard of the probability of causing, emotional distress." *Crouch v. Trinity Christian Ctr. of Santa Ana, Inc.*, 39 Cal. App. 5th 995, 1007 (2019).

As regards WCA preemption, Mofrad alleges that the infliction of emotional distress occurred at the workplace. FAC ¶¶ 13-21. Acts of intentional infliction of emotional distress based on conduct normally occurring in the workplace, in the normal course of the employer-employee relationship, are preempted by the WCA. *See Schaffer v. GTE, Inc.*, 40 Fed. Appx. 552, 557 (9th Cir. 2002) ("[U]nder California law, claims for negligent and intentional infliction of emotional distress made within the context of the employment relationship are within the exclusive remedy provisions of the [WCA]"). UPS concedes, however, if Mofrad's sexual harassment claim survives, the WCA likely does not bar this claim. *See* Reply at 12. As explained above, UPS is not entitled to summary judgment on Mofrad's sexual harassment claim, and WCA preemption accordingly does not resolve that claim.

As regards UPS's substantive challenge to the claim, California courts find that a "defendant's conduct is 'outrageous' when it is so 'extreme as to exceed all bounds of that usually tolerated in a civilized community." *Hughes v. Pair*, 46 Cal. 4th 1035, 1051 (2009). Indeed, "if properly pled, sexual harassment will constitute the outrageous behavior element of a cause of action for intentional infliction of emotional distress." *Fisher v. San Pedro Peninsula Hosp.*, 214 Cal. App. 3d 590, 618 (1989). Here, because disputes of material fact regarding Mofrad's sexual harassment claim remain, UPS is not entitled to summary judgment on his claim for IIED premised on that same sexual harassment. A jury will determine whether the conduct was sufficiently "outrageous." The Court therefore DENIES UPS's motion as to the fifth cause of action.

### G. Punitive Damages

Under California Law, a plaintiff may recover punitive damages "where it is proven by clear and convincing evidence that the defendant has been guilty of oppression, fraud, or malice." *See* Cal. Civ. Code § 3294(a). California Civil Code § 3294(b) allows for punitive damages against a corporation where such "oppression, fraud, or malice" is committed, authorized, or ratified by "an officer, director, or managing agent of the corporation." "The term 'managing agent' includes 'only those corporate employees who exercise substantial independent authority and judgment in their corporate decisionmaking so that their decisions ultimately determine corporate policy.'" *Tilkey v. Allstate Ins. Co.*, 56 Cal. App. 5th 521, 554 (2020); *White v. Ultramar, Inc.*, 21 Cal. 4th 573, 575 (1999). Simply serving as a manager or performing important job duties does not make an employee a managing agent. *Tilkey*, 56 Cal. App. 5th at 554. "The scope of an employee's discretion and authority is a question of fact." *Id.* at 554.

Mofrad contends that both Apodaca and Franklin Harris, Human Resources Business Partner Manager for UPS's Northern California District, meet the characteristics of managing agent for purposes of punitive damages. Mofrad claims, for example, that Apodaca "refused to investigate or take corrective action," "ordered [Mofrad] to continue working one-on-one with his harasser," and "gave him a negative year-end performance review." Opp. at 24. But Mofrad leaves out any reference to record evidence regarding Apodaca's discretionary authority. As regards Harris, Mofrad claims that Harris "made clear that [Mofrad]'s employment was terminated along with the accommodation process." Opp. at 24. As discussed above, denial of Mofrad's accommodation request submitted after receiving notice of his termination as part of the RIF does not constitute an adverse employment action, but further, Mofrad points to no facts evidencing Harris's discretionary authority. Mofrad has thus failed to raise a material issue of fact related to Apodaca or Harris falling within the category of managing agents, as their roles are far removed from "exercising substantial discretionary authority over significant aspects of a corporation's business." *See White*, 21 Cal. 4th at 577. The Court accordingly finds that punitive damages are not available to Mofrad on this record and GRANTS UPS's motion for summary judgment as to the availability of punitive damages.

## III. CONCLUSION

For the foregoing reasons, the Court hereby **GRANTS in part and DENIES in part** UPS's motion for summary judgment. In summary, the Court:

- (1) **DENIES** summary judgment as to the first cause of action, sexual harassment under FEHA;
- (2) **GRANTS** summary judgment as to the portion of the second cause of action, failure to correct and prevent sexual harassment, that relies on retaliation and **DENIES** summary judgment as to the portion of the cause of action derived from the alleged sexual harassment itself;
- (3) **GRANTS** summary judgment as to the third cause of action, retaliation under FEHA;
- (4) **GRANTS** summary judgment as to the fourth cause of action, failure to accommodate and engage in the interactive process under FEHA;
- (5) **DENIES** summary judgment as to the fifth cause of action, intentional infliction of emotional distress;
- (6) **GRANTS** summary judgment as to the sixth cause of action, retaliation under FEHA;
- (7) **GRANTS** summary judgment as to the seventh cause of action, failure to accommodate and engage in the interactive process under FEHA;
- (8) **DENIES** summary judgment as to the eighth cause of action, wrongful termination in violation of public policy as found in FEHA;
- (9) **GRANTS** summary judgment as to the ninth cause of action, wrongful termination in violation of public policy as found in the ADA; and
- **GRANTS** summary judgment as to Mofrad's claim for punitive damages.

**IT IS SO ORDERED.**

Dated: August 11, 2025

**ARACELI MARTÍNEZ-OLGUÍN**
**United States District Judge**